**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SVEN DEPICKERE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CELADON GROUP, INC., BOBBY L. PEAVLER, AND PAUL A. WILL,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sven Depickere ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Celadon Group, Inc. ("CGI" or the "Company"), analysts' reports and advisories about the Company, and information

readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired the publicly traded securities of CGI from September 13, 2016 through May 1, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased CGI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant CGI is a Delaware corporation with its principal place executive offices located at 9503 East 33rd Street, One Celadon Drive, Indianapolis, Indiana. CGI, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company's subsidiary, Celadon Trucking Service, Inc., is incorporated in New Jersey. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services. The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CGI."

8. Defendant Bobby L. Peavler ("Peavler") has served as CGI's Chief Financial Officer, Executive Vice President, and Treasurer throughout the Class Period.

9. Defendant Paul A. Will ("Will") has served at all relevant times as CGI's Chief Executive Officer throughout the Class Period.

10. Defendants Peavler and Will are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

15. On September 13, 2016, the Company filed a Form 10-K for the fiscal year ended June 30, 2016 (the "2016 10-K") with the SEC, disclosing the Company's quarterly and annual financial and operating results. The 2016 10-K was signed by Defendant Will and Peavler. Attached to the 2016 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Will and Peavler attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure all fraud.

16. The 2016 10-K stated the following with regards to the sale of revenue equipment:

> Gain on sale of revenue equipment decreased from $23.6 million in fiscal 2015 to $22.4 million in fiscal 2016. We expect gain on sale to decrease as we shift the focus of our equipment leasing and services segment to a more recurring revenue stream and to focus on ancillary services rather than sales of leased equipment. As we shift to a more recurring revenue stream we expect to reduce the potentially volatile impact of gains from sales of leased tractors and trailer. However, gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets.

17. On November 9, 2016, the Company filed a Form 10-Q for the quarter ended September 30, 2016 (the "2017 Q1 10-Q") with the SEC, disclosing the Company's quarterly and annual financial and operating results. The 2017 Q1 10-Q was signed by Defendant Will and Peavler. Attached to the 2017 Q1 10-Q were signed SOX certifications by Defendants Will and Peavler attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure all fraud.

18. The 2017 Q1 10-Q stated the following with regards to the sale of revenue equipment:

> Gain on sale of revenue equipment decreased from $13.2 million in first quarter of fiscal 2016 to $1.3 million in first quarter of fiscal 2017. The decrease resulted from a cessation in sales of leases and underlying equipment by our equipment leasing and services segment, fewer dispositions from our fleet, and lower prices for dispositions due to a weak used equipment market. We expect gain on sale to remain generally consistent with the levels experienced in the first quarter of fiscal 2017 as we have shifted the focus of our equipment leasing and services segment to a more recurring revenue stream and to focus on ancillary services rather than leasing and sales of leases and underlying equipment. The shift to a more recurring revenue stream, is expected to reduce the potential volatile impact of gains on sale of leased tractors and trailers. However, gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets. While we have no plans for our equipment leasing and services segment to acquire additional assets to lease or sell any significant additional leases and the

underlying equipment at this time, we will continue to evaluate opportunities as the market permits.

19. On December 30, 2016, CGI issued a press release touting the a joint venture with Element Fleet Management ("Element"), stating in relevant part:

**Celadon Group Announces Closing of Joint Venture with Element Fleet Management**

- Joint venture combines over 10,000 leasing assets under common management and ownership, creating a leading equipment lessor to the trucking industry

- Celadon's Quality Companies business unit contributes leasing assets and increases its recurring service revenue as service provider to the joint venture

- Non-controlling interest in joint venture to be accounted for under the equity method

INDIANAPOLIS, Dec. 30, 2016 /PRNewswire/ -- Celadon Group, Inc. (NYSE: CGI) ("Celadon") announced today that it has entered into a joint venture agreement with Element Transportation LLC ("Element"), a subsidiary of Element Fleet Management (TSX: EFN). The joint venture will hold leasing assets managed by Celadon's Quality Companies, LLC business unit ("Quality") and formerly held by a combination of Celadon (including, Element, and 19th Capital Group, LLC ("19th Capital"), a Delaware limited liability company.

**Company Statement**

Chairman and Chief Executive Officer Paul Will commented: "We are very pleased to announce the closing of our previously announced joint venture transaction with Element. Since August, we have been working diligently with the Element team to structure a high quality, well-capitalized business that will provide excellent transportation assets and high quality service to our customers. With the interests and investments of Element and Celadon strongly aligned, an experienced management team, and the resources to optimize leasing assets, the joint venture has the components for success. The support and business acumen of the Element team were instrumental to the process, and we appreciate their partnership.

"In addition to capitalizing a strong joint venture, the transactions furthered Celadon's goals of exiting the capital intensive component of the leasing business, reducing balance sheet debt, and converting our Quality Companies unit primarily to an asset light business. We believe the transaction has multiple benefits for our stockholders and are excited to be able to focus our resources on the trucking side of the business."

"We have built a long-term relationship with Celadon, and we are excited to deepen our partnership," stated Bradley Nullmeyer, Chief Executive Officer of Element. "This joint venture expands Element's position in the Class 8 tractor sector and provides a great opportunity to broaden our range of fleet services across a larger market, with a great partner."

20. On January 6, 2017, the Company filed a Form 8-K with the SEC further detailing the Joint Venture and its contributions thereto, including that the Company contributed a $31.8 million cash reimbursement of Lease Shortfall Advances received from Element, stating in part:

- The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used with a net book value of $63.6 million, and (iii) received credit for $1.1 million of unencumbered cash in the bank accounts of 19th Capital immediately at the consummation of the Transaction. In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital, (ii) paid to the Company $31.8 million in cash for reimbursement of previous payments made by the Company related to the Element assets, and (iii) issued the Company an obligation to distribute restricted cash of 19th Capital and its subsidiaries at the closing of the Transactions of approximately $2.5 million at such time as such cash becomes unrestricted. Going forward, the Company has agreed not to enter into additional leases as lessor in the equipment leasing business, subject to a modest exception for short-term leasing pending ordinary course dispositions from the Company's trucking fleet.

* * *

**Summary of Cash Sources and Uses**

The following table summarizes the Company's primary sources and uses of cash associated with the Transactions (excluding taxes, fees, and expenses):

| Source / (Use) (in millions) | Description |
|---|---|
| $ 4,600 | Cash received – redemption |
| 6,700 | Cash received – receipt of deferred purchase price cash |
| 50,000 | Cash received – sale of Quality equipment |
| 31,800 | Cash received – reimbursement of Other Assets |
| (35,300) | Cash invested in 19th Capital at closing |
| $ 57,800 | Net cash received at closing |

The foregoing excludes other sources and uses of cash during the quarter and should not be considered a substitute for the Company's net changes in cash during the quarter.

**Summary of Equipment Transactions**

The following table summarizes the Company's total contribution to 19th Capital at closing, including equipment dispositions associated with the Transactions:

| Source / (Use) (in millions) | | Description |
|---|---|---|
| $ | 56,000 | Equipment contributed to 19th Capital at closing |
| | 21,900 | Contribution of deferred sale assets from 9/30/2016 |
| | 50,000 | Equipment sold to Element at closing |
| | 34,600 | Settlement of deferred sale assets from 6/30/2016 |
| $ | 162,500 | Total equipment reduction at closing |
| | | |
| $ | 14,300 | Contribution of deferred sale liability from 9/30/2016 |
| | 26,000 | Settlement of deferred sale liability from 6/30/2016 |
| $ | 40,300 | Total reduction in liabilities at closing |
| | | |
| $ | 77,900 | Equipment contributed to 19th Capital at closing |
| | (14,300) | Other liabilities related to contributed deferred sales assets |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Undistributed cash remaining with 19th Capital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

21. On February 10, 2017, the Company filed a Form 10-Q for the quarter ended December 31, 2016 (the "2017 Q2 10-Q") with the SEC, disclosing the Company's quarterly and annual financial and operating results. The 2017 Q2 10-Q was signed by Defendant Will and Peavler. Attached to the 2017 Q2 10-Q were signed SOX certifications by Defendants Will and Peavler attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure all fraud.

22. The 2017 Q2 10-Q stated the following with regards to the sale of revenue equipment:

> Gain on sale of revenue equipment decreased from $5.5 million in second quarter of fiscal 2016 to $0.5 million in second quarter of fiscal 2017. This decrease was due to decreased equipment sales to third parties and a weaker used tractor

> market. We expect gain (loss) on sale with respect to revenue equipment to be relatively small for the balance of fiscal 2017. Gain (loss) on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets. Other than in connection with equipment turnover in our trucking operations fleet, we have no plans for our equipment leasing and services segment to acquire additional assets to lease or sell any significant additional leases and the underlying equipment at this time.

23. The 2017 Q2 10-Q stated the following with regards to the Company's collection of $31.8 million in Lease Shortfall Advances from Element and in-turn contribution of that money to the Joint Venture:

> **Non-Controlling Investment**
>
> In December 2016, the Company, Quality Companies LLC, a wholly-owned subsidiary of the Company ("Quality"), Quality Equipment Leasing, LLC, a wholly-owned subsidiary of the Company ("Leasing"), 19th Capital Group, LLC, a non-controlling investment of the Company before and after the transactions described below ("19th Capital"), Element Transportation LLC ("Element"), and certain other parties entered into a series of simultaneous agreements and related transactions (collectively, the "Transactions"), pursuant to which substantially all tractors under management by Quality and owned by Element, 19th Capital, Quality, and Leasing have been combined into 19th Capital as a joint venture primarily between the Company and Element. After the Transactions, the Company and Element each own a non-controlling approximately 49.99% interest in 19th Capital, which at December 31, 2016, held the rights to over 10,000 tractors for use in leasing operations. The Company recorded $100.0 million as a minority investment and will record operating results of the joint venture using the equity method of accounting. The Transactions included the following:
>
> - Redemption of Existing Members: 19th Capital redeemed all of its issued and outstanding membership interests, including those owned by the Company, for $15.7 million in cash. The Company's proceeds from the redemption were approximately $4.6 million in cash. The proceeds received relate primarily to the original $2.0 million that had been invested by the Company in 2015 and its proportionate share of undistributed earnings from inception. The Company recorded a net gain on the redemption of approximately $0.3 million, reflecting the excess of redemption proceeds over the initial investment plus equity income profits previously recognized. In addition to the redemption amount, the Company is entitled to receive approximately $2.5 million in restricted cash when the restrictions lapse. The Company has evaluated this receivable under ASC 450 – Contingencies and has not recorded a

receivable within our financial statements at this time. If and when collected, this amount would be recorded as income.

- Deferred Sale with 19th Capital: As part of the Transactions the Company received proceeds of $6.7 million in payment of deferred purchase price from a sale of equipment to 19th Capital in the June 30, 2016 quarter. This collection triggered sales accounting treatment for leased assets where recognition of the sale was deferred and leased assets remained on the Company's balance sheet. As a result, the Company removed $34.6 million of "Leased assets" and $26.0 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". The Company did not recognize any gain or loss with this transaction.

- Sale to Element: The Company sold tractors and trailers and assigned the related leases to Element for approximately $50.0 million. There was no material gain or loss on the disposition of this equipment.

- Receipt of Lease Servicing Advance ("Perfect Pay"): The Company received $31.8 million in cash related to a receivable from Element related to the Company's Perfect Pay obligations under the prior service agreements with Element.

- Contribution by the Company: The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used, with a net book value of $56.0 million, (iii) received credit for $1.1 million of amounts owed to the Company by 19th Capital and (iv) contributed $7.6 million of the remaining consideration due from 19th Capital related to a September 30, 2016 deferred sale transaction with 19th Capital that was previously recorded as a financing transaction under GAAP. The contribution of the $7.6 million resulted in the removal of "Leased assets" of $21.9 million and $14.3 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital.

- Summary of Transactions: The following table summarizes the Company's total contribution to 19th Capital at closing (in thousands):

| Contribution | | Description |
|---|---|---|
| $ | 56,000 | Equipment contributed to 19th Capital at closing |
| | 7,600 | Contribution of deferred sale receivable |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Receivable due from 19th Capital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

* * *

**Cash Flows**

***Net cash provided by operations for the six months ended December 31, 2016 was $58.5 million, compared to $22.9 million for the six months ended December 31, 2015. The increase reflected several items related to the closing of our joint venture in December 2016 and related equipment transactions during the period. These items include, $31.8 million in collection of cash payment recorded under other assets***, distributions received on earnings from an unconsolidated entity of $2.6 million, and a $16.9 million reduction in leased revenue equipment held for sale. Excluding these amounts, net cash flow provided by operations was $7.2 million for the six months ended December 31, 2016. Leased revenue equipment held for sale reflects $82.1 million of sales less $65.2 million of purchases for the six months ended December 31, 2016. These purchases relate solely to equipment for the benefit of our equipment leasing and services segment which activities will be undertaken through 19th Capital moving forward. Leased revenue equipment held for sale was zero at December 31, 2016. Purchases and sales of used Celadon fleet equipment are included within our net cash provided by investing activities.

(emphasis added).

24. The statements referenced in ¶¶ 15-23 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) CGI's equity contribution to its joint venture with Element Financial Corp. was $68.2 million, rather than the $100 million contribution as reported in its public filings; (2) CGI is being actively investigated by the SEC; (3) CGI's financial statement for the fiscal year ended June 30, 2016 could not be relied upon; (4) CGI's financial statement for quarter ended September 30, 2016 could not be relied upon; (5)

CGI's financial statement for quarter ended December 31, 2016 could not be relied upon; and (6) as a result, Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable bases at all relevant times.

## The Truth Emerges

25. On April 5, 2017, Prescience Point Research Group ("Prescience Point") published a detailed report on the Company alleging, among other things, that the Company overstated its investment in the Joint Venture by $31.8 million, stating in part:

> **CGI Lied RE Collecting on its $31.8m Shortfall Receivable. Is this the Smoking Gun that it's Falsifying its Financials?**
>
> Given that the Lease Shortfall Advances were a significant reason that cash flow had turned negative, investors were obviously concerned about these payments. CGI had highlighted that its JV arrangement would not require continued Lease Shortfall Advances. Furthermore, CGI prominently highlighted in its Q2' 17 earnings release filed on 2/01/2017 that it collected $31.8m of prior Lease Shortfall Advances from Element. Unfortunately, based on information provided in the JV subscription agreement, it appears that CGI never actually collected its Lease Shortfall Advances.
>
> - CGI received a sham Daylight loan from the JV: In the subscription agreement, CGI disclosed that Element provided a "Daylight loan" of $31.8m to the JV, the JV then gave the $31.8m to CGI, and then CGI paid the $31.8 million back to the JV to pay-off the outstanding contribution from Element. What essentially happened is Element gave CGI $31.8m and then CGI handed that $31.8m right back to Element (with the JV as an intermediary). The circular transaction created the illusion that CGI collected it Lease Shortfall Advances and made a $31.8m contribution to the JV, but this is just accounting gimmicks. No value was ever created or contributed to the JV.




> The specific details of the Lease Shortfall Advance and related Daylight loans are detailed below.
>
> - Element required to repay the Lease Shortfall Advances: CGI was obligated to provide lease shortfall payments to Element on an

ongoing basis. By the end of Q1'17, CGI had made $31.9m in payments to Element. These payments were capitalized (i.e. not expensed) on CGI balance sheet as "Lease Shortfall Advances" within Other Assets. In its Q1'17 10-Q, CGI noted that Element was obligated to reimburse them for these payments: "The financing provider is required to reimburse us for these advances and, accordingly, we have accounted for the related receivable under other assets on our consolidated balance sheet, in the amount of $31.9 million as of September 30, 2016 and June 30, 2016."

- CGI claims it collected its Lease Shortfall Advances from Element: In its 8-K filed on 1/6/2017, CGI claimed its $31.9m lease shortfall receivable had been almost completely reimbursed by Element as part of the JV closing:

**Net Cash Received from the JV Closing**

| *($ millions)* | Q2' 17 |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in JV at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

- As disclosed in the subscription agreement, Element loaned money to CGI: We believe the JV subscription agreement indicates that no collection occurred. Specifically, the subscription agreement details that Element provide a $31.8m "Daylight Loan" to the JV (i.e. "the Company" below), and then the JV would give the $31.8m received from Element to CGI.

  At the closing of the Element Investment,
  (i) Element shall transfer, convey, and assign to the Company the Element Assets;
  (ii) Element shall make a loan to the Company in the principal amount of $31,800,000 (the "Element Daylight Loan"),
  which shall be evidenced by this Agreement, and the Company shall pay $31,800,000 to Celadon in respect of the
  Payment; (Subscription Agreement, 02/10/17)

- As also disclosed in the subscription agreement, CGI immediately paid back the loan to Element: The subscription agreement further details that (1) CGI will transfer the cash to the JV (i.e. "the Company" below) and (2) the JV would repay the loan from Element. Thus, CGI gave the cash it received from the Daylight Loan right back to Element at the JV closing. This, in our opinion, proves without a shadow of a doubt that CGI created a gimmick loan to fool investors into believing that it collected its outstanding Lease Shortfall Advances.

> At the closing of the Celadon Investment,
> (i) Celadon shall transfer, sell, and assign all of its interests in the Quality Assets to the Company;
> (ii) Celadon shall transfer $31,800,000 in cash to an account designated by the Company, and the Company shall
> repay the Element Daylight Loan in full; (Subscription Agreement, 02/10/17)

26. On this news, shares of the Company fell $0.85 per share or approximately 14% from its previous closing price to close at $5.40 per share on April 5, 2017, damaging investors.

27. On April 19, 2017, Prescience Point published another article asserting that CGI is the subject of an active SEC investigation, stating in part:

> **CGI is Being Investigated by the SEC Enforcement Division**
>
> We received data in response to our Freedom of Information Act ("FOIA") requests that confirms CGI is the subject of an active SEC investigation. CGI has failed to disclose these proceedings.
>
> In a letter dated March 3, 2017, the FOIA office denied our request for access to CGI's investigative records by invoking Exemption (b)(7)(A) of the FOIA. Citation of the (b)(7)(A) exemption means that the SEC deems the release of information it has collected on CGI could be expected to interfere with law enforcement proceedings.
>
> ▪ An excerpt from the first page of the FOIA office's response letter is provided below:

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Stop 9612

March 13, 2017

[redacted]

Re: Appeal, Freedom of Information Act Request No. 17-01684-FOIA, designated on appeal as No. 17-00271-APPS

Dear [redacted]

This responds to your Freedom of Information Act (FOIA) appeal of the FOIA Officer's denial of your January 31, 2017 FOIA request for certain investigative records concerning Celadon Group, Inc. that the Commission has obtained or generated since January 1, 2013. By letter dated March 3, 2017, the FOIA Officer denied your request pursuant to FOIA Exemption (b)(7)(A). On March 9, 2017, you filed this appeal challenging the FOIA Officer's invocation of Exemption 7(A). I have considered your appeal and it is denied.

I have determined that the FOIA Officer correctly asserted Exemption 7(A).[1] There is a two-step test to determine whether information is protected under Exemption 7(A), whether: (1) a law enforcement proceeding is pending or prospective, and (2) release of information about it could reasonably be expected to cause some articulable harm.[2] We have confirmed with staff that releasing the withheld information could reasonably be expected to interfere with ongoing enforcement proceedings.[3]

28. On this news, shares of the Company fell $0.20 per share or approximately 5% from its previous closing price to close at $4.20 per share on April 19, 2017, further damaging investors.

29. On May 1, 2017, the Company filed a Form 8-K with the SEC during aftermarket hours revealing that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016 should no longer be relied upon, stating in part:

> **Item 4.02 Non-Reliance on Previously Issued Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) and (b) On April 25, 2017, BKD, LLP ("BKD"), the independent auditors for the Company, informed the chair of the Audit Committee of the Company's Board of Directors (the "Audit Committee") that it was withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon. BKD advised the Company that additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June 30, 2016 financial statements and after the issuance of BKD's review reports on

> the Company's September 30, 2016 and December 31, 2016 interim financial statements. BKD further advised the Company that, in accordance with PCAOB Auditing Standard 2905, BKD had performed procedures to evaluate this information, including requesting explanations and supporting documentation from the Company's management. Based on the results of BKD's procedures, BKD advised the Company that BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports for the periods indicated above. ***As a result, as of May 1, 2017, the Audit Committee has concluded that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of BKD, should not be relied upon.***
>
> The Audit Committee has discussed with BKD the matters disclosed under this Item 4.02. Based on these discussions, the Company understands the following: (i) BKD has not resigned as the Company's auditor; (ii) BKD has determined that it has not obtained sufficient appropriate audit evidence with respect to the revenue equipment held for sale transactions to determine that those transactions were properly recorded in accordance with GAAP; and (iii) BKD is prepared to review additional information, if any, and adjustments to the Company's financial statements, if any, and to then consider whether to re-issue the withdrawn reports.
>
> The insufficient appropriate audit evidence relates to the accounting (and related structure, substance, and disclosure) of transactions involving dispositions and acquisitions of revenue equipment between June and December of 2016 and the related carrying values. Additional information concerning the transactions and the fair values of the revenue equipment disposed of and acquired is required to determine the appropriateness of the accounting for these transactions. The need for additional information followed an Audit Committee request of BKD to perform additional procedures on the transactions prior to the normal audit cycle for fiscal 2017.
>
> The Company has provided BKD a copy of this Form 8-K and requested BKD to furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made in Item 4.02 of this Form 8-K, and, if not, stating the respects in which it does not agree. The Company has requested that BKD provide such letter as soon as possible, so that the Company can file such letter as an Exhibit to this Current Report on an amended Form 8-K within the time period prescribed by the Securities and Exchange Commission.
>
> (emphasis added).

30. On this news, shares of the Company fell $2.20 per share or 55% from its previous closing price to close at $1.80 per share on May 2, 2017, further damaging investors.

31. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of CGI during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged violated the federal securities laws;

b. whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c. whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e. whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

38. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's securities are traded in efficient markets;

d. the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on NYSE, and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g. Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h. Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

39. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

41. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon

plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

45. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

46. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

47. As a result of the foregoing, the market price of the Company's securities were artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially

inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

48. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

49. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

50. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

51. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

53. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the

Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

54. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

55. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complaint.

56. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 10, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff